# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | Criminal Case No. 95-cr-75-JJM-PAS |
| | ) | |
| GEORGE SEPULVEDA, | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., Chief United States District Judge.

## I.    INTRODUCTION

George Sepulveda, along with other members of the Latin Kings gang, was convicted in 1997 of a multicount racketeering indictment under RICO.[1] Mr. Sepulveda and co-Defendant Terrence Boyd had ordered other Latin King members to murder the leader of a rival gang, Jose Mendez. *United States v. Lara*, 181 F.3d 183, 202-03 (1st Cir. 1999). Mr. Sepulveda asks this Court to reduce his life without parole sentence under 18 U.S.C. § 3582(c)(1)(A)(i) asserting that his sentence was usually long considering the evolving science, law, and societal understanding of life sentences without parole for emerging adults. ECF No. 1364.

---

[1] A jury convicted Mr. Sepulveda of RICO, 18 U.S.C. § 1962(c), conspiracy to commit RICO, *id.* § 1962(d), committing a violent crime in aid of RICO (VCAR), *id.* § 1959(a)(1), witness intimidation, *id.* § 1512(b)(3), and possessing a firearm as a felon, *id.* § 922(g)(1). ECF No. 848 at 1-2.

## II.    FACTS OF THE 1997 CRIMINAL CONVICTION

On Saturday, November 5, 1994, several members of the Providence Latin Kings attended a party in Connecticut. They learned that their Connecticut Latin Kings counterparts were at war with a rival gang, the Netas. Two Connecticut Latin Kings returned to Rhode Island with the Providence contingent. At a meeting of the Providence chapter, Mr. Sepulveda told his cohorts about the war in Connecticut. Immediately after this announcement, the officers of the Providence chapter (including, at least, Mr. Sepulveda) went into an executive session and discussed a plan to kill the leader of the Netas in Providence.

Messrs. Sepulveda and Boyd made the final decision to have the leader of the rival Netas murdered. After the meeting adjourned, a small group, not including Mr. Sepulveda, met and finished the plan to kill the head of the Netas. Four members were assigned responsibility for conducting the assassination; Mr. Boyd and Shariff Roman each chose at least one member of the "hit squad." The next day, Mr. Roman distributed weapons from the gang's cache to the appointees. Mr. Mendez, the Neta vice-president, functioned as the head of the Netas in the president's absence. The "hit squad" invited Mr. Mendez, who was wearing his Neta colors at the time, to smoke some marijuana. The group, now five in number, walked to a nearby field where George Perry, a Latin King member, fired a .380 pistol into the back of Mr. Mendez's head, killing him. *Lara*, 181 F.3d at 203-04; ECF No. 911 at 39.

### III.    POST-CONVICTION PROCEEDINGS

After a trial by a jury, Mr. Sepulveda was found guilty of five counts:  Counts 1 (RICO), 2 (conspiracy to commit RICO), 4 (committing a violent crime in aid of RICO), 9 (witness intimidation), and 13 (possessing a firearm as a felon).  ECF No. 727.[2]

Consistent with the relevant Sentencing Guidelines ranges, the District Court imposed three concurrent life sentences for the RICO, RICO conspiracy, and violent crime convictions, a concurrent twenty-year incarcerative term for the witness intimidation conviction, and a concurrent ten-year incarcerative term for the firearms offense.  *Sepulveda v. United States*, 330 F.3d 55, 58 (1st Cir. 2003).  The First Circuit affirmed all the Defendants' convictions and sentences.  *Lara*, 181 F.3d at 206; *Sepulveda*, 330 F.3d at 58.

Mr. Sepulveda and his codefendants have extensively litigated their convictions and sentences since the jury returned verdicts against them. Mr. Sepulveda challenged his conviction in a series of post-conviction relief actions over the next two decades, filing motions both in the First Circuit and in the Federal District Court for the Middle District of Pennsylvania, where he was imprisoned.  *See, e.g.*, *Sepulveda v. Smith*, 213 F. App'x 125 (3d Cir. 2007) (unpublished) (dismissing as procedurally inappropriate Defendant's claim that his jury was not drawn from a representative cross-section of the community); *Sepulveda v. Marriana*, Civ. No. 14-

---

[2] The jury found him not guilty of racketeering in Count Seven–extortion of Donna Silva.  ECF No. 261 at 15-16.

2398, 2015 WL2131610, at *1 (M.D. Pa. May 7, 2015) (summarizing Defendant's cases in the federal courts in Pennsylvania and Rhode Island).

In 2018, Mr. Sepulveda filed a motion seeking to modify his sentence under 18 U.S.C. § 3582(c) based on the argument that the immaturity of his adolescent brain made him inherently less culpable for the crimes he committed in 1994. *See* ECF No. 1222. He further contended that he had made great strides in rehabilitating himself and should be resentenced due to those efforts as well as because of his renunciation of gang affiliations, his horrible childhood, and the youthful age at which he had committed the crimes. *Id.* at 3-6. This Court denied Defendant's motion by Text Order, finding that, at that time, the Court did not have a legal basis for considering such a motion. *See* Text Order dated Sept. 24, 2018.

In 2019, Mr. Sepulveda moved for early termination under 18 U.S.C. § 3582(c)(1)(A)(i) (so-called "compassionate release"). ECF No. 1234. Mr. Sepulveda asserted that he had compiled a "remarkable" record of rehabilitation and that "new" scientific findings supported his claim that he committed his crimes at a time of immaturity. Along with his record of accomplishments in prison, Mr. Sepulveda again filed testimony from another case to support his claims. The District Court denied this motion by Text Order because Mr. Sepulveda had failed to exhaust his administrative remedies. *See* Text Order Dec. 2, 2019. In late December 2019, Mr. Sepulveda filed another motion under 18 U.S.C. § 3582(c)(1)(A)(i) after he exhausted his remedy with the BOP. ECF No. 1241. Again, relying on brain science, Mr. Sepulveda asserted that he deserved a reduction in sentence because his criminal

behaviors in this case resulted from the impulsivity and susceptibility to peer pressure from which he suffered as a youth. He said that he had no violent disciplinary infractions, had taken advantage of many educational opportunities, was no longer a gang member, and was sincerely remorseful. He claimed that because he had committed the crimes due to his youthful immaturity, he could be released as a mature adult without endangering the community. Mr. Sepulveda also pointed to the "glaring disparity" between his life sentence and the much shorter sentences of defendants who had pleaded guilty. *Id.* at 18. The court rejected his request to reduce his sentence. ECF No. 1272. In moving for reconsideration, Mr. Sepulveda reiterated his prior arguments and complained that he had never been offered a plea bargain. ECF No. 1278. The District Court denied Defendant's Motion for Reconsideration (ECF No. 1278). *See* Text Order dated Dec. 2, 2020. The First Circuit affirmed, holding there was no error in the District Court's finding that (1) no extraordinary and compelling reasons existed so as to warrant a reduction of Mr. Sepulveda's life sentence; (2) his young age at the time of his crimes did not present an extraordinary and compelling reason for compassionate release; and (3) rehabilitation over 25 years, by itself, was not an extraordinary and compelling reason for granting compassionate release. *United States v. Sepulveda*, 34 F.4th 71, 76-77 (1st Cir. 2022).

Two years after the denial of his first motion under 18 U.S.C. § 3582(c)(1)(A), Mr. Sepulveda again seeks a sentence reduction.

## IV.    LEGAL STANDARD

A defendant seeking an early release (so-called "compassionate release") must meet several requirements. *United States v. Rivera-Rodríguez*, 75 F.4th 1, 18–19 (1st Cir. 2023). First, they must properly raise the request by meeting the exhaustion requirements in 18 U.S.C. § 3582(c)(1)(A). *Id.* at 19. Second, they must present sufficient "extraordinary and compelling reasons" to call for the reduction. *Id.* Third, consideration of the sentencing factors listed in 18 U.S.C. § 3553(a) must weigh in favor of a reduction. *Id.*; *United States v. Quirós-Morales*, 83 F.4th 79, 84 (1st Cir. 2023). Finally, a defendant must not present "a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(a)(2). The defendant bears the burden of proving that their circumstances qualify for early release. *See Rivera-Rodríguez*, 75 F.4th at 18–19.

In 2023, the Sentencing Commission revised U.S.S.G. § 1B1.13, the applicable policy statement, because of the changes prescribed in the First Step Act. *See* 88 Fed. Reg. 28254, 28254-28281 (May 3, 2023); *Quirós-Morales*, 83 F.4th at 84. The updated policy statement on compassionate release motions, both extended the "applicability of its policy statement to prisoner-initiated motions and expand[ed] the scope of what can be considered an extraordinary and compelling reason warranting a sentence reduction." *Quirós-Morales*, 83 F.4th at 84 (citing *Rivera-Rodríguez*, 75 F.4th at 18 n.22).

As revised, § 1B1.13 states that a district court may consider changes in law (including changes that Congress has chosen not to make retroactive) when deciding

6

whether a defendant has presented an extraordinary and compelling reason justifying release. Relevant here are two subsections of revised Guideline § 1B1.13:

> (5) OTHER REASONS.—The defendant presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4).

> (6) UNUSUALLY LONG SENTENCE.—If a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment, a change in the law (other than an amendment to the Guidelines Manual that has not been made retroactive) may be considered in determining whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances.

Section 1B1.13(b)(5) is the catch-all provision that allows a court to consider any other circumstances that are similar in gravity to the listed circumstances. Section 1B1.13(b)(6) indicates that a court may consider changes in the law (other than nonretroactive Guideline amendments) when a defendant seeking release previously "received an unusually long sentence" of imprisonment that would produce a gross disparity and has "served at least 10 years" of that term.

The First Circuit instructs district courts to consider almost "any complex of circumstances" that a defendant alleges as a potential extraordinary and compelling reason for early release. *United States v. Gonzalez*, 68 F.4th 699, 704 (1st Cir.), *cert. denied*, 144 S. Ct. 217 (2023). The only limitations imposed on a district court's

discretion[3] were "rehabilitation alone," the "mere fact of a 'pre-First Step Act mandatory life sentence . . .standing alone,'" and "classic post-conviction arguments, without more . . . ." *Id.* at n.3; *see also Quirós-Morales*, 83 F.4th at 83. The First Circuit "made pellucid that district courts 'may conduct a holistic review to determine whether the [prisoner's] individualized circumstances, taken in the aggregate, present an 'extraordinary and compelling' reason to grant compassionate release.'" *Quirós-Morales*, 83 F.4th at 83 (quoting *United States v. Ruvalcaba*, 26 F.4th 14, 27 (1st Cir. 2022)).

## V.    DISCUSSION

To support his motion for modification of his term of imprisonment,[4] Mr. Sepulveda cites as extraordinary and compelling reasons his youthful age at the time of the offense, his turbulent upbringing, his traumatic brain injury, his unusually long sentence compared to similarly situated defendants, risks posed by COVID-19, ongoing medical conditions, and his rehabilitation.

---

[3] "A district court faced with a compassionate release motion has ample, yet not boundless, discretion at both steps. District courts may consider any complex of circumstances raised by a defendant as forming an extraordinary and compelling reason warranting relief. Because the whole may be greater than the sum of its parts, district courts must be mindful of the holistic context of a defendant's individual case when deciding whether the defendant's circumstances satisfy the extraordinary and compelling standard. Yet this standard is narrow and stringent, because whether a reason is extraordinary and compelling is logically guided by the plain meaning of those terms." *United States v. D'Angelo*, 110 F.4th 42, 49 (1st Cir. 2024) (citations and internal quotation marks omitted).

[4] Mr. Sepulveda has met the exhaustion requirements in 18 U.S.C. § 3582(c)(1)(A).

Mr. Sepulveda's main argument is that his life sentence without parole is an unusually long sentence under U.S.S.G. § 1B1.13(b)(6) because he committed the crime when he was just 20 years old. To qualify for a modified sentence, a defendant's sentence must be unusually long, and he must have served 10 years of it. § 1B1.13(b)(6). The latter requirement is undisputedly met—Mr. Sepulveda has been imprisoned under the judgment and conviction in this case for almost 30 years. The central question is whether a sentence of life without parole for an emerging adult, aged 20, is now considered unusually long.

The legal landscape and contemporary standards of decency about youthful offenders[5] have changed since this Court denied Mr. Sepulveda's first motion to reduce his sentence in 2020. There is an emerging movement in the scientific, medical, sociological, and legal disciplines to better understand how the criminal justice system should adjudicate crimes committed by young offenders,[6] in particular

---

[5] "[Y]oung adult offenders aged 18-24 are more similar to juveniles than to adults with respect to their offending, maturation, and life circumstances." Rolf Loeber, David P. Farrington & David Petechuk, *Bulletin 1: From Juvenile Delinquency to Young Adult Offending*, NAT'L INST. JUST., at 20 (2013), https://www.ojp.gov/pdffiles1/nij/grants/242931.pdf.

[6] *See also, e.g., United States v. Ramsay*, 538 F. Supp. 3d 407, 411-12 (S.D.N.Y. 2021) (life sentence reduced for man convicted of murder in aid of racketeering for shooting into a crowd as part of a gang dispute.); *United States v. Fisher*, 493 F. Supp. 3d 231, 235-36, 239 (S.D.N.Y. 2020) (reducing a life sentence for involvement with a violent narcotics ring to time-served given defendant's admirable rehabilitation and the COVID-19 pandemic); *United States v. Tidwell*, 476 F. Supp. 3d 66, 80 (E.D. Pa. 2020) (releasing a man serving a life sentence for, among other things, two counts of murder in furtherance of a continuing criminal enterprise); *United States v. Curtis*, No. 03-533 (BAH), 2020 WL 1935543, at *1 (D.D.C. April 22, 2020) (releasing defendant under § 3582(c)(1)(A) despite his six concurrent terms of life for operation of a sex-trafficking ring involving minors); *United States v. Williams*, No. 3:04cr95, 2020 WL 1751545, at *3 (N.D. Fla. Apr. 1, 2020) (granting release and reducing a life

when they are subject to a sentence of life without the possibility of parole.  As one

Court succinctly said recently,

> [T]here has been a marked development in Supreme Court jurisprudence surrounding a defendant's age in sentencing.  The Supreme Court has recently emphasized that "youth matters in sentencing." *See Jones v. Mississippi*, 593 U.S. 98, 105 (2021).  It previously explained that "the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences of juvenile offenders, even when they commit terrible crimes." *Miller v. Alabama*, 567 U.S. 460, 472 (2012).  In recent years, the Supreme Court and lower courts have relied on scientific development regarding youth and brain development to "better understand the neurological differences in young brains that can drive youthful crimes." *United States v. Johnson,* No. 05-CR-00167, 2021 WL 5037679, at *2 (N.D. Cal. Oct. 30, 2021).

*United States v. Bryant*, No. 2:06-cr-00234-GMN-GWF-1, 2024 WL 2028268, at *5

(D. Nev. May 6, 2024).

---

sentence for conviction of armed robbery because defendant's health concerns were serious enough that "an outbreak of COVID-19 in [Defendant's] facility would likely have fatal consequences for him."); *In re Monschke*, 482 P.3d 276 (Wa. 2021) (the Supreme Court of Washington considered evolving standards of decency, updated brain science, and precedent to conclude that mandatory sentences of life without parole violate the Washington Constitution when meted out to those under twenty-one when they committed the crime.); *McCoy v. United States*, No. 2:03-cr-197, 2020 WL 2738225, at *5-6 (E.D. Va. May 26, 2020) (finding that defendant's "relative youth at the time of the sentence"—20 years old—helps to form "an extraordinary and compelling basis for relief"), *aff'd*, 981 F.3d 271, 286 (4th Cir. 2020); *United States v. Maumau*, No. 2:08-cr-00758-TC-11, 2020 WL 806121, at *5 (D. Utah Feb. 18, 2020), *aff'd*, 993 F.3d 821 (10th Cir. 2021) (finding defendant's age—20 years old—an extraordinary and compelling ground for relief); *United States v. Gantt*, No. 10-10175-01, 2023 WL 2140151, at *3, *5 (D. Kan. Feb. 21, 2023) (21 years old); *United States v. Gregory*, No. 07-CR-73, 2021 WL 5450692, at *5 (N.D. Okla. Nov. 22, 2021) (26 years old); *Bellamy v. United States*, 474 F. Supp. 3d 777, 786 (E.D. Va. 2020) (21 years old).

Building on these developments, a major change in how the law treats emerging adults occurred in 2024, when the Massachusetts Supreme Judicial Court struck down as unconstitutional sentences of life without parole for youthful offenders, finding that "[a]n assessment of a punishment's proportionality occurs 'in light of contemporary standards of decency which mark the progress of society.'" *Commonwealth v. Mattis*, 224 N.E.3d 410, 420 (Mass. 2024) (quoting *Diatchenko v. Dist. Att'y for Suffolk Dist.*, 1 N.E.3d 270, 283 (2013)). That court went on to observe:

> Advancements in scientific research have confirmed what many know well through experience: the brains of emerging adults are not fully mature. Specifically, the scientific record strongly supports the contention that emerging adults have the same core neurological characteristics as juveniles have. As the Superior Court judge noted, "Today, neuroscientists and behavioral psychologists know significantly more about the structure and function of the brains of [eighteen] through [twenty year olds] than they did [twenty] years ago ...." This is the result of years of targeted research and greater access to relatively new and sophisticated brain imaging techniques.
>
> **********
>
> [E]merging adults (1) have a lack of impulse control similar to sixteen and seventeen year olds in emotionally arousing situations, (2) are more prone to risk taking in pursuit of rewards than those under eighteen years and those over twenty-one years, (3) are more susceptible to peer influence than individuals over twenty-one years, and (4) have a greater capacity for change than older individuals due to the plasticity of their brains. The driving forces behind these behavioral differences are the anatomical and physiological differences between the brains of emerging and older adults. *See* Steinberg, A Social Neuroscience Perspective on Adolescent Risk-Taking, 28 Developmental Rev. 78, 82-84, 85-89 (2008). These structural and functional differences make emerging adults, like juveniles, "particularly vulnerable to risk-taking that can lead to poor outcomes."

*Id.* at 420-21.

The court in *Mattis* also highlight other states who have recognized that emerging adult offenders require different treatment from older adult offenders, citing the District of Columbia, Illinois, California, Colorado, and Wyoming as examples:

> the District of Columbia now provides a chance at sentence reduction for people who were under twenty-five years old when they committed a crime. D.C. Code § 24-403.03. In 2019, Illinois enacted a law allowing parole review at ten or twenty years into a sentence for most crimes, exclusive of sentences of life without parole, if the individual was under twenty-one years old at the time of the offense. 730 Ill. Comp. Stat. 5/5-4.5-115. Effective January 1, 2024, Illinois also ended life without parole for most individuals under twenty-one years old, allowing review after they serve forty years. Ill. Pub. L. No. 102-1128, § 5 (2022). California has extended youth offender parole eligibility to individuals who committed offenses before twenty-five years of age. Cal. Penal Code § 3051. Similarly, in 2021, Colorado expanded specialized program eligibility, usually reserved for juveniles, to adults who were under twenty-one when they committed a felony. Colo. House Bill No. 21-1209 (2021) (enacted). In Wyoming, "youthful offender" programs were revised to offer reduced and alternative sentencing for those under thirty years old. Wyo. Stat. Ann. §§ 7-13-1002, 7-13-1003.

*Mattis*, 224 N.E.3d at 425.

When Mr. Sepulveda committed his crime, he was twenty years old. He had experienced a very traumatic upbringing, being raised in a poor, unstable, and abusive environment in which he and his family suffered from extreme physical and emotional abuse for many years. From a very young age, Mr. Sepulveda had to watch his mother get repeatedly beaten by his stepfather, was himself beaten, and then, after a time, had to flee with his mother and younger sibling from New York to Rhode Island to escape the abuse. Unfortunately, his abusive stepfather learned of their location and followed them to Rhode Island where the physical abuse continued, along

with psychological abuse in the form of constant fear of death due to threats made by his stepfather with firearms. He then was sent to live with drug addicted family members that pushed him to sell drugs to survive, and at just 14 years old, he ended up on the street where he was welcomed in by the Latin Kings gang. He became dependent on the gang for food, clothing, money, and a place to live. They became his source of survival, safety, and structure—his de facto new family.

While Mr. Sepulveda's upbringing does not excuse his serious criminal behavior, when combined with what we now know about the development of young people's brains, the Court must review this sentence to properly assess his level of culpability and the appropriate sentence necessary to accomplish the goals of 18 U.S.C. § 3553 for his crime. Mr. Sepulveda had just turned 20 years old when he committed the crime of ordering the murder of the head of a rival gang.[7] He was not the trigger person (or even present when the murder took place). The question here is not whether Mr. Sepulveda committed an extremely serious crime with horrible outcomes—he did—but whether, under current and evolving notions of culpability and appropriate sentences that are sufficient but not more than necessary, a life sentence without the possibility of parole is an unusually long sentence when

---

[7] Other courts have reduced sentences for former Latin Kings previously sentenced to life. *United States v. Cruz*, No. 3:94-CR-112 (JCH), 2021 WL 1326851, at *1-2 (D. Conn. Apr. 9, 2021) (the court reduced a life sentence for a former Latin Ling member with similar charges to Mr. Sepulveda); *United States v. Rios*, No. 3:94CR112 (JBA), 2020 WL 7246440, at *1, 3 (D. Conn. Dec. 8, 2020) (the court reduced the life sentenced of a twenty-seven-year-old member of the Latin Kings with six prior felony convictions, to three concurrent terms of life imprisonment for a "cold-blooded murder.").

someone committed such a crime at a young age. The Court has concluded that today, it is no longer appropriate to sentence a youthful offender, under these circumstances to a sentence of death in prison. This presents extraordinary and compelling reasons to modify Mr. Sepulveda's sentence.

## VI.  REMEDY

While the Court has determined that a life without parole sentence for Mr. Sepulveda represents a sentence that is unusually long considering his age at the time he committed the crime, the fact that he was not the perpetrator of the murder, and other factors concerning his history and characteristics, the Court cannot determine at this time, under 18 U.S.C. § 3553(a) what is the appropriate less-than-life sentence. Toward that end, the Court orders a resentencing for Mr. Sepulveda including an updated Presentence Investigation Report, appointment of counsel for Mr. Sepulveda's resentencing, notification and input from the victim(s), briefing by the government and Mr. Sepulveda's attorney, and a sentencing hearing.

## VII.  CONCLUSION

The Court GRANTS Mr. Sepulveda's Motion to Reduce his Sentence, ECF No. 1364, subject to further proceedings by the Court to determine the appropriate reduction.

IT IS SO ORDERED.

_____

John J. McConnell, Jr.
Chief Judge
United States District Court


January 10, 2025